Good morning. Good morning, Your Honors. We're here because in our... Can you tell us your name for the appearance, please? Pamela Price of Price & Associates, appearing on behalf of Plaintiff Ronald L. Malik Curtis, who is also present, Your Honor. We're here because, in our view, Your Honor, the lower court made two obvious errors with respect to the hostile work environment claim and some, and I apologize, I'd like to reserve five minutes for rebuttal. Thank you. We believe that the court ignored the totality of the circumstances in this case. That she viewed the experience that Mr. Curtis described and his coworkers supported in their complaints, she viewed that through the lens of her own experience, when, in fact, that's exactly the kind of mistake that the Ninth Circuit, both in Draper and McGinnis, has counseled against. That when you look at, when the court looks at circumstances through the lens of her or his own experience, then things become innocuous and, therefore, the court can decide, well, this is reasonable or not. When, in fact, the law requires, and the teachings that we have in this area, are that the court must view the evidence from the perspective of a reasonable African-American firefighter. Let me ask you this. You know, obviously, this particular shift has been, there are a lot of problems, and firefighters probably have it worse, in the sense, because they live together. You know, what, they're on 24, off 48, or whatever. And the district court appeared to feel that the behavior was facially neutral. So some of our other circuits have held that facially neutral conduct can provide a basis for hostile work environment claim, where there is evidence of other overtly racial, racially discriminatory conduct. What overtly racially discriminatory conduct was there here? In our view, the stereotyping of one of Mr. Curtis's coworkers, I believe Mr. Muhammad, when he was accused of having the beanie over his face and walking around with a puffed-up chest, that that was, he was essentially being racially profiled at that point by one of his coworkers. I believe that's the one early incident where it became clear that there was some racial animosity. I think that certainly the African-American firefighters perceived that the conduct that they were being subjected to in the form of being shunned, not being spoken to as a group, not just on a one, both individually and as a group, and also not being given the same privileges to exchange shifts. That there was no, while it wasn't accompanied by a direct racial statement that we're doing this to you because you're black, they were receiving this treatment and being treated as a group. And the only differing or unifying characteristic that they had at that time was their race. And so we would argue that that is, while it's not overt in the sense of a direct, what we typically look for as a direct racial slur or something overt, it's the treatment itself. Can you clarify something for me? Yes, Your Honor. When you were talking about conduct that was aimed at them, was that at the shift? Is that what you mean, or at these particular black individuals? At the particular black individuals who were limited to B shift. So, for instance, when --. There were three at the time? No, I believe there were five. Were there any, I know the city makes a large point of how diverse the entire, you know, department is. As far as that goes. So, but in this particular shift, were there, at this was Station 1, right? Yes, Your Honor. So were all the blacks on one shift in Station 1? Yes, Your Honor. Yes. That's my feeling. And so. Well, that's what I, but, so they were told they couldn't do what? The firefighters have the option to trade. Yeah. And so that was what they began to experience was that they were not, they have to be able to trade. If they're B shift, they have to be able to trade shifts with C or with A. And they weren't able to do that. And these individuals were told you can't do it? Well, they weren't able to. It's a voluntary thing. The other person, on the other shifts, they have to agree to do that for you. Oh, I see. Yes. Ms. Price, I'm interested in where you began with the fact that we, Article 3 judges, Judge Weinstein has a wonderful opinion on this where he says, you know, the life of an Article 3 judge doesn't let us see the way, in essence, why jurors are so important. They see things a lot. So this part of the hostile work environment analysis, the objective part of it and the subjective part of it, here's what I've got. You've got an affidavit from Moore that says prior to Mr. Curtis going there in 07 and 04 and 05, there was evidence of racism. Yes. And I know that's contested by the city. But can you go through with me and tell me the objective and then the subjective way that the district court should have looked at these incidents? Sure. All right. The objective way that we say is that the court should have considered the declarations of Mr. Moore, of Mr. Muhammad, of Ms. Holmes, of all of those persons that said, this is what I experienced, and I have no other explanation for why I experienced it other than my race. And that was, in our view, not subjective from Mr. Curtis's perspective, but reflected the objective view or the objective evidence of other observers who had similar experiences with him, similar experiences to him. So you're saying, let me interrupt. So you're saying Mr. Curtis comes to work in 07 with a, with the reality of Mr. Moore's knowledge that there's a racist environment at the fire department, B shift, and then what the district court later characterizes as neutral acts that don't have a known perpetrator, that's the way the district court should have seen this? I think the district court should have put, yes, sir, I think the district court should have put it in context. And that's what EEOC versus NEA teaches in this circuit, is that it doesn't have to be an overt racial slur. It doesn't have to be, you don't have to have direct evidence of people making inappropriate racial comments in the workplace to understand that people are being treated differently because of their race, and while the district court may view it as somewhat innocuous or reasonable or have some explanation for it, and that's what we have in this case. The court consistently looks at it and says, well, this is a reasonable explanation. They were just playing games with the honey. They were just doing this, they were just doing that. And so she consistently takes the objective evidence and makes it innocuous and says, well, it's not racially charged in and of itself, so therefore I can't consider this as any type of actual misconduct. So that alters the working conditions for an African-American firefighter that a district judge has difficulty understanding. Yes. And it's exactly what Judge Callahan said, that this is a firehouse. They live together. This is so, this is a completely different environment for them. They have to be able to rely upon each other. The basic rule, you do not bother people's food. You don't play games with food. That's fundamental. You have to be able to rely upon a firefighter to give you correct and accurate information at change of shift. And what about the bird? Yeah, the bird, the dead bird under the bed. Right. The dead bird under the bed, again, is a situation where the court says, well, the white firefighters say there was a bird flying around, and therefore, you know, it must have just been something innocent, something that just happened to happen. But you have the African-American firefighters that say, we've never seen a bird in this place. There's no way for a bird to even get into this place. Somehow the inference that should have been drawn, which a jury could have drawn, is that someone brought that bird in and put it under his bed because he was the, seen as the pivotal person within this complaining group. And that is a jury question. If you have evidence that there's never been a bird, that there's really no way for a bird to get there, for the district court to conclude that, oh, well, nobody knows, it could have been on the seal, it could have flown in, when there's direct evidence that says, no, birds don't fly in, these windows don't open, the doors aren't open in a way that allows a bird to come into. Well, give me your best argument on, okay, there are a couple of, there was the, there was putting the African-American pictures up, and then there was the clown picture, right? So how, there are a couple of ways to look at that, but there's one that you could say that the, I don't know, it was the black chief, I think, that got the clown picture put over his face. And so, you know, I think there can be an argument made that that could be looked at racially. Then you had the, I don't know, the hoodie thing or the, you know, that situation. Then those would be the most racially, the ones that would be the most overtly racial, and then the other things that happened were things that, there's the dead bird under his bed, his car keys go, they, the car keys go missing, and aren't there some conversations of, even though they didn't catch anyone, they were found, I guess, up, they were somewhere in the fire station, and there was some snickering that was heard about, he's still looking for his keys or something. And then there was the spitting in the food, and, which wouldn't only have affected him, but he was affected by it, and then there was the honey that allegedly, one explanation was that it was a prank, and then the honey got left over, and then there were the ants. So then he, in terms of the adverse actions on retaliation, he got a day, he got a write-up, which he claimed he wasn't late, but that he got a write-up on that. He had a day of suspension, and then he got fired, right? So those are the adverse actions we're talking. He was not terminated. Okay. He is still working there. Oh, okay. He had to move to a different station.  But he received a written reprimand. Okay. Which is, you know. So am I missing any of the conduct that was at the, then there's the conduct that occurs that anyone could find offensive, but that no one was caught, and that the judge sort of said, well, that's bad for anyone, it's not necessarily racially charged. I mentioned two instances where I could see potentially some racial overtones to it. Is there anything else in there that you want to direct our attention to? I think that it's important, certainly from Firefighter Curtis's perspective, to appreciate that the paper documentation clearly suggests that he was being targeted by Defendant Therese. There are a number of memorandums, there were a number of confrontations that were initiated by him that went up the chain of command, and all of this, these documents were unbeknownst to Mr. Curtis, and he's being accused of things. He's essentially being targeted, and I think that's the one piece that the Court may be missing, is that. Well, on the retaliation, what's the closest temporal connection that Mr. Curtis can show between the alleged instance of protected activity and an adverse action? I think I mean, I can see the key instances of protected activity and adverse action appear to be Mr. Curtis's filing of the second complaint in February or March of 2009 and the Department's decision to discipline him in September or October. So these would appear to be about six months apart. Is that too far to infer causation on that timing alone? I don't think it's too far to infer causation, but clearly it's an extended period of time. But certainly our view is that there were a number of actions in between there. The Department's Do you want to maybe You're getting low on your time. Do you want to save it and then respond? Yes. Am I Because you're Yeah, you're about at a minute and a half. Okay. Yes, Your Honor. Okay. And maybe if you want to add those when you come back, you can gather them up. Okay. Thank you. Thank you very much. Good morning. Good morning, Your Honors. May it please the Court. My name is Christine Maloney. I represent the City of Oakland and the individual defendants, Simon, Ray, Torres, and Farrell. I think I'm going to address some of the questions I heard the panel raise to the appellant, because those are the areas you're most interested in. Well, maybe you can start with, like, the district courts seem to say that, okay, you didn't catch anyone in any of these, so, yeah, it's a bad place, these are all bad things, but you can't link it. Given that the Caucasian, just I'm doing this in terms of because firefighters were heard joking about the dead bird under Mr. Curtis's bed and Curtis's lost keys, do we have to infer for purposes of summary judgment that they were responsible for those incidents or at least knew something about them? The district court didn't seem to give any inference on that. There's no evidence anywhere in the record that appellant or any of the persons who support him in his complaints have any information as to how the bird got there. He calls it an act. Well, yeah, but you don't have to catch someone in the act and have it on video to say that. You have to have some reasonable basis to attribute it to an actor as opposed to something that happens to all of us maybe in our lives from time to time. Well, I think I can pretty obviously say that where the keys were found and the circumstance that it happened, it certainly seems like it was one of the firefighters. And if I'm just looking at it in terms of if I were assessing it relative to my kids and if I caught one of the kids snickering about it, I'd certainly, they had knowledge about it, so they have some knowledge in terms of who the perpetrator is and it was the Caucasian firefighters that are snickering about it. Well, you can infer perhaps that a firefighter knew something about it, but what you also have to understand is that you can infer that a firefighter did it because it was in the firefighter station, right? I mean, that's not open to the public where everyone can just walk around and steal someone's keys and then hide them someplace in there, right? And what you will discover in firehouses is that there are a lot of practical jokes made all the time that have nothing to do with protected classes. If you can infer from the facts that the keys were intentionally placed there because of where they were found behind a TV, there's no evidence that that was directed at the plaintiff because of his race. Where is that evidence in the record? There isn't any. The plaintiff keeps referring to the fact that B-shift was the African-American shift and they were segregated. Those are conclusions unsupported by any facts in this record. They chose B-shift. That was a voluntary choice to sign up for B-shift. They weren't assigned there. Here's what concerns me on summary judgment. You may be exactly right that this could go to trial and they could say that Mr. Curtis is as much of the problem as everyone else and this is perhaps the worst shift in the world and they've just got all these miscreants and misfits and it's just run amuck and not give them a dime. But in terms of the more instances that I have to explain them that way, it gets harder that there's not some contested issue. And there's a lot that I have to explain away here to get to the fact that summary judgment is appropriate. But there's not a lot. There's really not. I mean, we're talking over a three-year period, eight incidents, and none of those race-based. There isn't a single piece of evidence that the plaintiff has in this case linked to his race. He certainly has a subjective belief, but on summary judgment, here's why. Here's why this isn't just we need to go to trial because it's their belief and opinion that they were discriminated against. On summary judgment, we go back to basics. We have to have testimony based on personal knowledge. We have to have evidence that is specific and admissible. We cannot rely on conclusions, speculation, or conjecture. Very basic summary judgment principles. But the more smoke there gets, the closer it gets to a material issue. Can I address a case that the plaintiff mentioned? It's the EEOC case versus the National Education Association. She's relying on that case to show that there doesn't have to be overt protected class activity. In that case, there was evidence to show that there was disparate treatment in that non-sex-based conduct, both in quality and quantity. There's no such evidence here. What evidence is there? I mean, I take your point that this is a firehouse. They spent a lot of time there. And there's a tendency for them to play some jokes, fool around, do things because they're waiting, just sitting around waiting for the call. But what evidence is there that similar incidents happened with respect to all the other, the white firefighters? So let's start with the honey. The evidence in the only evidence in the record with respect to the honey is that two other firefighters, not African-American, were playing with saran wrap and honey and pranking each other with respect to that, and that the jar of honey broke and spilled on the floor. Remember, this cabin or bunk is not the plaintiff's exclusively. He shares it with other firefighters. No, no, no. I'm asking, I'm not asking that. That's directed at, what your explanation is that that was directed at nobody. What I'm trying to say, what jokes were played, what does the record show as to what jokes were played on the white firefighters? Was there a bird put under the bed of somebody else? Was there, did they move this clown mascot picture around and put it over a white person's bed? What is there that shows that there's? Okay. I thought I was answering that with respect to the honey because that was non-African- Americans pranking each other. That would be an example. I don't know that there's other examples in the record of non-African-Americans pranking, but I'm not sure there's any evidence in the record beyond keys that suggests that any of these were pranks on Mr. Curtis. Actually, there is one other item in the record with respect to pranks, and that is the famous syrup. Monte Gardea testified that he put tap water in the syrup before 2007, before the prank a officer on the B-shift who was non-African-American. That's another example that's in the record. With respect to the clown picture, oh, my gosh, I would love to address the clown picture. This is a picture that says on it, downtown clowns, and has a caricature of a clown. That picture has hung in Station 1 for decades. It's their mascot. They labeled themselves the downtown clowns because they are located in downtown Oakland. That picture is hung on the wall in its place for many years until the plaintiff came and removed it so he could install pictures of African-American firefighters. The evidence in the record, the only evidence in the record, is that somebody found that picture not hung in another room, sitting down on the ground, and brought it back to the room that it was hung in and hung it above their pictures. He did not cover, the firefighter who hung this, did not cover any of Mr. Curtis's African-American firefighter pictures. He hung it above in the place it always was. And if you look at the record, the plaintiff admits in his deposition that he had never been offended by that picture. He had seen it there. He never thought it had a racial connotation until this day when somebody hung it back in the room. Nobody hung it over the face of anybody in one of those pictures. I don't see how under the circumstances of this case anybody could possibly draw the inference that that is a race-based activity. The plaintiff is correct that on summary judgment we draw all reasonable inferences in favor of the nonmoving party, but those have to be reasonable inferences. Ms. Maloney, let me ask you a couple of things that I don't think are pranks, and I didn't really get the context of this, but there's a handoff that takes place when one shift ends and the next one begins. There was controversy in the record about I think the handoff happens between the plaintiff and Mr. Mui, M-U-I. And I guess that handoff is here's what we did to make sure all the equipment is working. He testified that he wasn't being treated well, he, Mr. Curtis. At least that's my understanding of the record. Secondly, he said, and this is again a work benefit, he says, I'm not able to, they're not letting me drive or the other African-Americans drive because apparently when you drive that helps you in terms of your promotion. Am I right? Explain that part of the record to me. Okay. With respect to the Mui handoff, that's an allegation of an event that occurred one day. Okay. And it was during a shift change when Mr. Mui was approached by the plaintiff and asked about one apparatus. Is this apparatus okay? And he said it was. Then the plaintiff asked him about a second apparatus. Mr. Mui heard that he was asked about one item. The plaintiff contended he asked about a different piece of equipment. When Mr. Mui was asked that question about the second piece of equipment, he said, I don't know, I didn't drive it. And there was a misunderstanding between them, is what the evidence reflects, as to what he was being asked. It was in good repair. That's your side of the story. Yeah. Not their side of the story. Right? Well, that's the factual evidence in the record. What about the stealing of his personal items that he, that a bunch of items ended up being, showing up missing, and it certainly appears that some people, is it that no one got caught on that? There's evidence that the plaintiff went out on leave. He took leave in 2000, end of 2009, beginning of 2010 when he refused to go to conflict resolution training. He decided to go on medical leave instead of attend that. And when he came back to work, his equipment had been misplaced. He eventually found all of it. That's not what I, that's not what it said in the record. He said he had to replace certain. So is that disputed? I don't, I do not believe there's any evidence from his deposition that said he had to replace items. I believe he testified in his deposition that he ultimately found all the items that had been misplaced. Should all of his items have been in one spot? I mean, does, do you usually put someone all of their, is that, I mean, would it be an inference that someone is giving you a hard time if they put all of your items in different spots and you have to go on a treasure hunt to find them? Not when you leave the workplace for over a month period of time or several weeks anyhow. If they're your personal items, do other people have a right to, can other people just go use your personal items? No, but you ought to secure them in a place where they will be. So then it would be his fault that he didn't secure them and that other people put them in a bunch of different spots? Partially. But where, where is the facts that cause one to be able to reasonably infer that that was because of his race? Ms. Maloney, what's the historical record about the downtown station in terms of its race history that's in this record? You know, I don't, I don't want your personal history. Tell me the record. The Moore Affidavit, does that accurately describe the alleged race problems that existed at the downtown station? Absolutely not. Okay. Those declarations do not reflect any history that the City of Oakland has ever heard before or is aware of. And I will tell you that there are some very curious things about those declarations in terms of the time of those three declarants. I'm talking about Mohammed Moore, I forget the third person's name. But when the human resources people looked at those declarations, they pulled the employment records that showed they did not work at Station 1 or the V-Shift as they declared under penalty of perjury that they did. Now you can imagine that the City of Oakland Fire Department, being a public safety agency who responds to emergencies, keeps copious notes of the officers who show up on every shift. Station 1 has a logbook that goes back to 1959 that shows every firefighter who worked every shift of every day since then. And those records were examined and refuted by the Donahom Declaration to show that they did not work in Station 1 when they professed to work there. If you also look at their declarations. What did the district court do? Was this before the district court? Yes. Did the district court say anything about this? This was the substantial part of oral argument. I did not present oral argument, but that was the primary crux of what I understand the argument to be, was these were bogus. Yes. Go back and tell me about the driving that I asked you about earlier. Okay. So the driving, if I'm understanding the issue you're talking about, is the ability to rotate driving the engine. Captain Torres was the captain of B Shift for several years. I think he joined in 2004. And up until he was in an injury accident on the job, it was his practice to not rotate his driver. He wanted one person who drove consistently whose performance he knew. And that was the case until he was injured in April of 2008 and took a 10-month medical leave. When the new captain came into that assignment, who, by the way, was Caucasian, he implemented a rotation where all the members of B Squad had an opportunity to drive that truck. When Captain Torres returned from his injury leave, he reinstituted the one driver. He went back to his practice. And the evidence in the record is that it's the captain's prerogative how he wants to run his squad in that way. He didn't treat anybody any differently. It was what he always did, except on the 10 months when he was on injury leave and somebody else was running that squad. All right. You just have about 24 seconds left, so you might want to sum up. Okay. With respect to these declarations, the three that you mentioned, Mr. Moore, if you look at those, those are conclusion-based declarations. They don't, when they say, I heard people refer to the brothers when I was at Station 1, they don't say who said that, when it was said, what the circumstances were. We don't even know if it involved the same firefighters who were there in 2007 to 2010. And without that, it has no probative value as to whether this plaintiff was subject to racial harassment. With that, if there's no other questions, I'll rest. Thank you for your argument. I would first offer, in response to the Court's earlier question, the events of February of 2009, I believe, established proximity with respect to the actions directed towards Mr. Curtis that we allege are retaliatory. Specifically, the clown, his complaint about the posting of the clown photograph and the mascot occurred, and that whole incident occurred on February the 3rd, 2009. And I want to point out, it's not simply that Mr. Curtis saw the clown photo and he never complained about it before. It's the fact that on this date, this clown photo, the way it was placed, was disrespectful to the African-American firefighters, that he believed he had gotten permission to post those photographs there. There's a dispute about whether or not the person who said that they could put the clown mascot back up there actually had already approved Mr. Curtis placing those photographs there. So it's the placement of the photographs. And we presented the picture that shows the placement that was offensive, not only to Mr. Curtis, but to his colleagues. After that February 3rd encounter with Mr. Torres and Mr. Curtis' complaint about the clown photo, on February 6th, Defendant Ray tried to have him undergo drug testing and a fitness for duty examination. He filed his second EOPD complaint on the 10th. And on the 27th of February, Defendant Ray accused him of insubordination and all of the things that flowed from the February 3rd, 2009 incident began to occur. So that, we believe, is proximity. They didn't, everything that happened in October, they're saying, really flowed from what happened in February. And they were. All right. You've moved into overtime. So unless my colleagues have any questions, which if they do. Ms. Price, I just have one. The pervasiveness element seems to be something the district court concentrated on. And Ms. Maloney mentioned, well, there were only eight incidents over a 30-month period of time. What's your response to pervasiveness? Because I know an incident of gender bias or race bias can be pervasiveness. But when you've got neutrality arguments and no direct evidence, it seems to me it takes more than one incident. What's your response to pervasiveness in this record? Is that you cannot look at these incidents as discrete incidents without looking, again, at the totality of the circumstances. What the African-American firefighters reported and documented was that we can't trade shifts, we can't, people get up and walk out of rooms when we walk in. And this is something that's happening on a continuing, almost daily basis. And it's consistently happening over a long period of time. So that goes to pervasiveness. All right. Thank you. And on that regard, Mr. I just want to point out that the complaint about Firefighter Muey and his failure to turn over the shift, that predated. That was not a single incident. Mr. Curtis documented that that was occurring on an ongoing basis as well. All right. Thank you both for your argument. This matter will stand submitted.
judges: Pratt, Schroeder, Callahan